UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO/CLC,<br><br>Plaintiff,<br><br>v.<br><br>Hibbing Joint Venture, Cliffs Mining Company Managing Agent, and Cleveland Cliffs, Inc.,<br><br>Defendants. | Civil No. 06-4820 (PAM/RLE)<br><br><br><br><br><br>**MEMORANDUM AND ORDER** |

This matter is before the Court on cross-Motions for Summary Judgment. For the reasons that follow, the Court grants Plaintiff's Motion and denies Defendants' Motion.

**BACKGROUND**

Defendants mine and process iron ore at several facilities in Minnesota. Plaintiff United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union represents a unit of production and maintenance employees at Defendants' site in Hibbing, Minnesota.

**A.    The Collective Bargaining Agreement**

On August 1, 2004, Plaintiff and Defendants Hibbing Joint Venture and Cliffs Mining Company Managing Agent executed a collective bargaining agreement (CBA), which governs working conditions of Defendants' production and maintenance employees and "similar employees represented by the Union in any other of the Company's iron ore mines

hereinafter acquired or operated in the Lake Superior region" until September 1, 2008. (Compl. Ex. A at 1.) Two CBA provisions are at issue in this case: Subsection 2 of Section XXI and Appendix X (collectively "Neutrality Provisions"). Both establish procedures for Plaintiff to obtain voluntary recognition at non-union facilities, provided that Plaintiff produces a showing of majority support based on signed union authorization cards.

In Subsection 2 of Section XXI, Defendants agreed to adopt a neutral position[1] regarding the unionization of its employees and to aid the organization campaign by posting notice of the campaign, providing the union with a list of all employees in the proposed bargaining unit who are eligible for union representation, meeting with the union to define the appropriate bargaining unit, and providing access to company facilities for the purposes of distributing literature and meeting with employees. The parties also agreed to a card check to determine whether a majority of eligible employees had signed union cards, if the union demanded recognition during the organization campaign. (Id. at 166-67.)

Subsection 2 also describes how the parties will develop a collective bargaining agreement if the union is recognized:

> The employer and the Union shall meet within fourteen days following recognition to begin negotiations for a first collective bargaining agreement covering the new unit. In these negotiations the parties shall bear in mind the wages, benefits and working conditions in the most comparable operations of the Company (if any comparable operations exist) and those of unionized competitors to the facility in which the newly recognized unit is located.

---

[1] Neutrality means that "the Company will not in any way, directly or indirectly, involve itself in any matter which involves the unionization of its employees, including but not limited to efforts by the Union to represent the Company's employees or efforts by its employees to investigate or pursue unionization." (Compl. Ex. A at 163.)

(Id. at 169.) If the parties are unable to reach a collective bargaining agreement, "the matter may be submitted to final offer interest arbitration[2] in accordance with procedures to be developed by the parties." (Id.) "If interest arbitration is invoked, it shall be a final offer package interest arbitration proceeding. . . . The arbitrator shall select one or the other of the final offer packages submitted by the parties on the unresolved issues." (Id.)

Finally, Subsection 2 contains a provision on how to resolve disputes relating to the Neutrality Provisions:

> Any alleged violation or dispute involving the terms of this Subsection may be brought to a joint committee of one representative each from the Company and the Union. If the alleged violation or dispute cannot be satisfactorily resolved by the parties, either party may submit such dispute to the arbitrator. . . . All decisions by the arbitrator . . . shall be based on the terms of this Section and the applicable provisions of the law. The arbitrator's remedial authority shall include the power to issue an order requiring the Company to recognize the Union where, in all the circumstances, such an order would be appropriate. The arbitrator's award shall be final and binding on the parties and all employees covered by this Section. Each party expressly waives the right to seek judicial review of said award; however, each party retains the right to seek judicial enforcement of said award.

(Id. at 170.)

Appendix X of the CBA is a side letter on neutrality. It specifically notes that the parties discussed the application of Subsection 2 to the operations at Northshore Mining Company in Silver Bay, Minnesota. It further recognizes that Defendants agreed to the dispute resolution process if the parties are unable to agree on the appropriate bargaining unit. Finally, it states:

---

[2] During final offer interest arbitration, the arbitrator chooses among final positions of the parties to the dispute instead of proposing an intermediate position. It aims to encourage parties to submit reasonable demands.

3

> If during the initial organizing drive [of] Northshore, the Company commits a material violation (one that would render a fair organizing drive unlikely) of this letter, the Union may invoke the arbitration provision of this letter to determine if such violation has in fact occurred. . . . If the arbitrator were to determine that a non-material violation of the Neutrality provision(s) had occurred, he has the authority to fashion a remedy that best assures that a fair opportunity to organize has been granted. If the arbitrator finds that because of a material violation the conducting of a fair organizing drive is unlikely . . . , the parties have agreed that . . . a bargaining order . . . is a reasonable remedy. This arbitration process shall apply only to the initial organizing drive at Northshore.

(Id. at 243.)

**B.    Dana Corporation**

On September 30, 2004 the General Counsel of the National Labor Relations Board issued a complaint in Dana Corporation, alleging that a letter of agreement with provisions similar to those at issue here was unlawful under the National Labor Relations Act. (Clark Aff. Ex. E. at 2.) Specifically, the employer in Dana Corporation agreed to take a neutral position on union organizing, to provide a list of employees and their contact information, and to provide access to the union during the workday. (Id. at 3-4.) The union agreed not to strike. (Id. at 5.) The Dana Corporation agreement also identified a dispute resolution process to use if the parties were unable to reach a collective bargaining agreement, and that procedure culminated in interest arbitration. (Id. at 7.)

In April 2005, the administrative law judge in Dana Corporation rejected the General Counsel's position and held that the letter of agreement was not an unlawful pre-recognition contract. Specifically, while recognizing that the letter of agreement "touch[ed] upon" terms and conditions of employment, the agreement did not deal with significant matters such as

wages and benefits, grievance procedures, or union security. (Id.) The administrative law judge distinguished Majestic Weaving Co., 147 N.L.R.B. 859 (1964),[3] and relied on Kroger Co., 219 N.L.R.B. 388 (1975).[4] (Id. at 8-9.)

The General Counsel has appealed the Dana Corporation decision to the National Labor Relations Board, arguing that a pre-majority negotiation of the substantive terms and conditions of employment, in exchange for card check and neutrality provisions, violates Section 7 of the National Labor Relations Act. Based on the General Counsel's position in Dana Corporation, Defendants advised Plaintiff in July 2005 that several elements of the Neutrality Provisions should be modified to comply with the law. However, the parties failed to agree on modifications.

## C. Plaintiff's Attempt to Organize Northshore Mining Company

In March 2006, Plaintiff notified Defendants of its intent to begin organizing the production and maintenance workers at Northshore Mining Company. (Scully Aff. Ex. 3.) It therefore requested that Defendants provide Plaintiff with a list of all eligible employees

---

[3] In Majestic Weaving, the Board held that the employer violated the National Labor Relations Act by recognizing and negotiating a tentative contract with a union when the union did not have majority support of the employees. The contract was conditioned upon the union gaining majority support from the employees. The administrative law judge in Dana Corporation distinguished Majestic Weaving on two grounds. First, it noted that the Board in Majestic Weaving concluded that the employer had recognized the union apart from negotiating a contract. Second, the collective bargaining agreement in Majestic Weaving was complete and whole.

[4] In Kroger, the Board held that collective bargaining agreement provisions, which required an employer to recognize the union as the bargaining representative of employees at additional, future facilities if the union received majority support at the new facility, were lawful.

5

and their contact information. (Id.)

Defendants refused and objected to the attempted invocation of the Neutrality Provisions because they believed that the provisions were illegal. Specifically, they warned that "any organizing that takes place under the existing agreement could subject both the Union and the Company to unfair labor practice charges from employees, be they in support of organizing or opposed." (Scully Aff. Ex. 2.) Defendants also opined that the purportedly unlawful provisions rendered the entire agreement unenforceable. (Id.) They therefore suggested that the parties modify the agreement. (Id.; see also Scully Aff. Ex. 4.)

On May 1, 2006, union director Robert Bratulich released Defendants from complying with the first contract interest arbitration provisions set forth in Sections E.6.c. and d. of Subsection 2. He also informed Defendants that Plaintiff would commence an organization campaign, asked Defendants to supply Plaintiff with a list of all eligible employees and their contact information, and requested an opportunity for the employees to meet with Institute of Employee Choice consultants. He also informed Defendants that Plaintiff would distribute a wage and benefit comparison chart to Northshore Mining Company employees. Defendants responded that the release of the first contract interest arbitration provision "failed to adequately address our concerns about the legality of the Neutrality Agreement." (Bratulich Aff. Ex. D.) Thereafter, the parties unsuccessfully attempted to modify the Neutrality Provisions. In August 2006, Plaintiff offered to forego invoking the Neutrality Provisions for six months in exchange for information on the employees. Defendants

declined.

In October 2006, Plaintiff attempted to invoke arbitration to determine whether the Neutrality Provisions were enforceable. (Scully Aff. Ex. 5.) Defendants refused to arbitrate, contending that the issue was not arbitrable because the Neutrality Provisions were unlawful. On December 8, 2006, Plaintiff commenced this action under Section 301 of the Labor Management Relations Act to compel arbitration.

On the same day, Defendants filed an unfair labor practice charge, alleging that Plaintiff violated Sections 8(b)(1)(A) and 8(b)(3) of the National Labor Relations Act by attempting to enforce the purportedly unlawful Neutrality Provisions. On May 31, 2007, the Office of the General Counsel of the National Labor Relations Board recommended dismissal of the unfair labor practice charge. Specifically, the Office stated:

> We conclude that the union's unilateral efforts . . . to compel the employer to honor the terms of the Neutrality Agreement, including filing a . . . suit, do not restrain or coerce employees within the meaning of Section 8(b)(1)(A). . . .
>
> Regardless of the legality of the Neutrality Agreement provisions the Employer challenges, the Union's peaceful unilateral invocation of the arbitral and judicial processes does not restrain or coerce employees within the meaning of Section 8(b)(1)(A).

(Clark Aff. Ex. B at 2-4.) The Office concluded: "If the Union prevails in its Section 301 suit and the employer contends that any provision of the award is unlawful, it may file another charge at that time." (Id. at 4.) The National Labor Relations Board Director dismissed the charge on June 13, 2007. Defendants thereafter appealed the dismissal, and the appeal is now before the National Labor Relations Board.

**DISCUSSION**

**A.     Standard of Review**

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Id. The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. Enter. Bank v. Magna Bank, 92 F.3d 743, 747 (8th Cir. 1996). However, "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action." Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Enter. Bank, 92 F.3d at 747. A party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials, but must set forth specific facts in the record showing that there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

**B.     Substantive Attack on Neutrality Provisions**

Defendants argue that the Neutrality Provisions are unlawful and that the Court would be enforcing unlawful provisions by compelling arbitration. Specifically, they rely on the position of the General Counsel in Dana Corporation to argue that the Neutrality Provisions impose representation and substantive terms and conditions of employment on Northshore Mining Company employees, who have yet to show whether they desire union representation. As examples, Defendants identify provisions that purportedly "settle"

8

specific terms and conditions of employment, such as the no-strike provision, the access provision, the provision to "bear in mind" the working conditions of comparable operations when developing the collective bargaining agreement, and the first contract interest arbitration provisions.

Defendants cite <u>Teamsters Local Union 682 v. KCI Construction Co.</u>, 384 F.3d 532 (8th Cir. 2004) and <u>ACE Electric Contractors, Inc. v. IBEW Local 292</u>, 414 F.3d 896 (8th Cir. 2005) to argue that the Court cannot enforce an illegal contract. In <u>KCI Construction</u>, a union sought to vacate an arbitrator's award that found that the union violated a no-strike clause. 384 F.3d at 536. The district court granted summary judgment to the employer and confirmed the arbitration award. <u>Id.</u> The Eighth Circuit Court of Appeals reversed, finding a question of fact as to whether the arbitration award indirectly enforced a hot cargo agreement.[5] <u>Id.</u> at 537-41. In <u>ACE Electric Contractors</u>, the employer sought to vacate an arbitrator award that purportedly violated the Minnesota Human Rights Act (MHRA). 414 F.3d at 898. The district court granted summary judgment to the employer and vacated the award. <u>Id.</u> The Eighth Circuit Court of Appeals affirmed, concluding that a collective bargaining agreement provision requiring the employer to make an employment decision based on age was "directly contrary to the plain language of the public policy articulated in the MHRA." <u>Id.</u> at 903.

By relying on these cases, Defendants are putting the cart before the horse. In both

---

[5] Section 8(e) of the National Labor Relations Act precludes an employer and union from entering into a hot cargo agreement, which requires the employer to cease doing business with another employer. <u>KCI Constr. Co.</u>, 384 F.3d at 537 (citing 29 U.S.C. § 158(e)).

KCI Construction and ACE Electrical Contractors, the issue was whether the arbitration awards were enforceable. Thus, the courts were faced with determining the validity of specific contract provisions on which the arbitration awards were based. In this action, Plaintiff is not asking for enforcement of an arbitration award—it is merely seeking an order compelling arbitration.

Moreover, it is unclear whether the Neutrality Provisions are illegal. Although the General Counsel takes the position that such provisions violate the National Labor Relations Act, the administrative law judge in Dana Corporation rejected that position. Furthermore, at least one federal court has rejected a similar attack on a neutrality provision. In Hotel Employees & Restaurant Employees Union v. Sage Hospitality Res., L.L.C., 299 F. Supp. 2d 461 (W.D. Pa. 2003), the court recognized:

> The National Labor Relations Board is generally granted primary jurisdiction over matters regarding labor relations, such as unfair labor practices and representation issues. A union and an employer can, however, reach a private agreement to provide an alternative method of deciding union representation. In fact, card check procedures similar to the one disputed in this case have been upheld by other courts. In this case, the parties signed an agreement that allowed for union certification through an alternative method rather than the NRLB's election procedure. Because it was not illegal for them to do so, we cannot say that the contract was illegal under Section 7 of the NLRA.

Id. at 465 (citations omitted).

Notably, Defendants cite no judicial decision to support their position—only the argument of the General Counsel.[6]

---

[6] Plaintiff also emphasizes that it released Defendants from complying with the first contract interest arbitration provision and that even if Plaintiff wanted to enforce the interest arbitration provisions, it could not invoke them until 120 days after achieving recognition. Although true, these arguments do not cover all of Defendants' attacks on the Neutrality

Finally, Defendants are challenging the validity of the Neutrality Provisions as a whole. Where a party challenges the validity of an entire agreement and not the arbitration clause specifically, "the issue of the contract's validity is considered by the arbitrator in the first instance." Buckeye Check Cashing, Inc. v. Cardegna, 126 S. Ct. 1204, 1209 (2006); see also Cook v. N.J. Bldg. Laborers Statewide Benefit Funds, No. 07-2934, 2007 WL 2245770, at *5 (Aug. 1, 2007) (relying on Buckeye Check Cashing to reject challenge to the validity of a collective bargaining agreement as a whole); Hotel Employees & Rest. Employees Int'l Union Welfare Fund v. Conn. Gen. Life Ins., No. 07-712, 2007 WL 1030454, at *2 (N.D. Ill. Mar. 27, 2007) (relying on Buckeye Check Cashing to enforce a collective bargaining agreement's arbitration clause); Auto. Mechs. Local 701 v. Vanguard Car Rental USA, Inc., No. 06-1719, 2006 WL 3490375, at *2 (N.D. Ill. Nov. 29, 2006) (same); Down to Earth Landscaping v. N.J. Bldg. Laborers Dist. Council Local 595, No. 06-578, 2006 WL 1373169, *3 (D. N.J. May 17, 2006) (citing Buckeye Check Cashing to reject an attack on the validity of a collective bargaining agreement). Thus, the Court is not enforcing unlawful provisions by compelling arbitration.

---

Provisions, as Defendants challenge more than just the first contract interest arbitration provision.

11

**C.     Jurisdiction of the National Labor Relations Board**

Relying on the preemption doctrine established in San Diego Building Trades Council v. Garmon, 359 U.S. 236 (1959),[7] Defendants contend that the National Labor Relations Board has primary jurisdiction over the issue of whether the Neutrality Provisions are legal. They therefore argue that compelling arbitration would supplant the jurisdiction of the Board.

The Board has broad discretion to determine appropriate bargaining units. Bell Cold Storage, Inc. v. Over-the-Road Transfer, Cold Storage, Grocery & Mkt. Drivers, Helpers & Inside Employees Union, Local No. 544, 885 F.2d 436, 439 (8th Cir. 1989) (citing 29 U.S.C. § 159(b)). Nevertheless, federal courts may compel arbitration of representational issues under Section 301 of the Labor Management Relations Act. Id. (citation omitted). The Board is not subsequently bound by an arbitrator's findings on a representation issue. Id. (citations omitted). However, the Board has considerable discretion to respect an existing arbitration award and may decline to exercise its authority over alleged unfair labor practices. Id.

The landmark case on this issue is Carey v. Westinghouse Electric Corporation, 375 U.S. 261 (1964). In that case, a union filed a Section 301 suit to compel arbitration under a collective bargaining agreement. Id. at 263. The union asserted that it was the appropriate bargaining representative for certain employees, even though a different union was certified as the employees' exclusive bargaining agent. Id. The employer refused to arbitrate what it

---

[7] Garmon requires federal courts to "defer to the exclusive competence of the National Labor Relations Board" whenever "an activity is arguably subject" to Section 7 or Section 8 of the National Labor Relations Act. 359 U.S. at 245.

considered to be a purely representational matter.  Id.  Although the collective bargaining agreement contained a provision requiring arbitration of unresolved disputes, a state court refused to compel arbitration, reasoning that the Board had exclusive jurisdiction.  Id.

The United States Supreme Court reversed.  It recognized that the dispute involved a representational issue but nonetheless held that the employer was obligated to submit to arbitration.  It reasoned that arbitration "is proper, even though an alternative remedy before the Board is available, which, if invoked by the employer, will protect him."  Id. at 268.  Further, although the dispute may ultimately come before the Board, prior "resort to arbitration may have a pervasive, curative effect" and will encourage "those conciliatory measures which Congress deemed vital to 'industrial peace' and which may be dispositive of the entire dispute."  Id. at 272.  If the Board subsequently disagreed with the arbitrator's decision, "the Board's ruling would, of course, take precedence" and the "superior authority of the Board may be invoked at any time.  Meanwhile the therapy of arbitration is brought to bear in a complicated and troubled area."  Id.

In subsequent cases, courts have found that a decisive factor in Carey was the "very strong policy favoring the invocation of arbitration to resolve all kinds of labor disputes under collective bargaining agreements providing for arbitration."  Bell Cold Storage, Inc., 885 F.2d at 441 (citation omitted).  Thus, Carey supports jurisdiction under Section 301 to compel arbitration of a dispute "where the parties have agreed under the collective bargaining agreement to arbitrate such matters."  Id. (citations omitted); see also Local Union 204 of the Int'l Bhd. of Elec. Workers v. Iowa Elec. Light & Power Co., 668 F.2d 413, 419 (8th Cir.

1982) (citations omitted).

Moreover, in labor contracts with arbitration clauses, the presumption of arbitrability is very strong. Int'l Bhd. of Elec. Workers, Local No. 4 v. KTVI-TV, Inc., 985 F.2d 415, 416 (8th Cir. 1993). Thus, the Court will compel arbitration "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." United Steelworkers of Am. v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582-83 (1960). Where a collective bargaining agreement can be interpreted to cover a dispute that is not explicitly excluded by the agreement, all doubts must be resolved in favor of arbitrability. AT&T Techs., Inc. v. Comm'ns Workers of Am., 475 U.S. 643, 648-50 (1986).

Finally, that a particular activity may constitute an unfair labor practice does not necessarily preclude the Court's jurisdiction under Section 301 if the activity also constitutes a breach of the collective bargaining agreement. Local Union No. 884, United Rubber, Cork, Linoleum, and Plastic Workers of Am. v. Bridgestone/Firestone, Inc., 61 F.3d 1347, 1356 (8th Cir. 1995) (citations omitted). When "a party's conduct gives rise to both a charge of an unfair labor practice and a claimed breach of a collective bargaining agreement, the [Board] and the district court share concurrent jurisdiction." Id. (citation omitted).

In this case, the arbitration clause in the Neutrality Provisions provides that either party may submit to an arbitrator any "alleged violation or dispute involving the terms of this Subsection." Plaintiff seeks arbitration to determine whether Defendants wrongfully refused to comply with the obligations imposed under the Neutrality Provisions. The dispute clearly

falls within the arbitration provision.

**CONCLUSION**

Arbitration is not only therapeutic, but it is what the parties bargained for. If the arbitrator orders a remedy Defendants believe violates the National Labor Relations Act, it may file charges with the National Labor Relations Board at that time. The Board either will defer to the arbitrator's award or disregard it if it is inconsistent with established law. Indeed, the Office of the General Counsel suggested such a course of action when it recommended that Defendants' unfair labor practice charge be dismissed. Because the disputed issue falls within the scope of the arbitration provision, the Court compels arbitration. Accordingly, **IT IS HEREBY ORDERED** that:

1. Defendants' Motion for Summary Judgment (Docket No. 19) is **DENIED**;

2. Plaintiff's Motion for Summary Judgment (Docket No. 31) is **GRANTED**; and

3. Defendants are **ORDERED** to arbitrate the parties' present dispute pursuant to the Neutrality Provisions.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

Dated: September 4, 2007

s/ Paul A. Magnuson
Paul A. Magnuson
United States District Court Judge